IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2025 Session

**STATE OF TENNESSEE v. JOHN W. SMITH**

**Appeal from the Circuit Court for Grundy County**
**No. 2019-CR-6235  Bradley Sherman, Judge**
_____

**No. M2024-01336-CCA-R3-CD**
_____

A Grundy County jury convicted the defendant, John W. Smith, of one count of first-degree murder, one count of attempted first-degree murder, one count of attempted second-degree murder, one count of aggravated assault, and eight counts of reckless endangerment, for which he received an effective sentence of life imprisonment plus twenty-two years.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions.  The defendant also argues the trial court erred in admitting the 911 calls, in refusing to admit Jerome Powell's statement that "she had her gun then," and in imposing an excessive sentence.  Following our review, we affirm the defendant's convictions. However, we reverse the imposition of consecutive sentences and remand to the trial court for a new sentencing hearing for consideration of the consecutive sentencing factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).  We also remand for corrected judgment forms in counts five, fourteen, and fifteen.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Paul D. Cross and Howell G. Clements, Monteagle, Tennessee, for the appellant, John W. Smith.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Courtney Lynch, District Attorney General; and Steve Strain and Taffy Wilson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## Facts and Procedural History

This case arises from the September 23, 2018 shootings of Nicole Powell[1], Jerome Powell, and Gary Hurst. For his actions, the defendant was charged with first-degree murder (count one), attempted first-degree murder (count two), attempted second-degree murder (count three), aggravated assault (count four), nine counts of reckless endangerment (counts five, six, seven, eight, nine, ten, eleven, twelve, and thirteen), felon in possession of a handgun (count fourteen), and employing a firearm during the commission of a dangerous felony (count fifteen).[2] At trial, the State presented the following facts for the jury's review.

On September 23, 2018, Betty and Jerome Powell were having a birthday party for their twelve-year-old grandson, L.B.[3] They invited their daughter, the victim, and her children, twelve-year-old J.S., nine-year-old C.S., two-year-old R.S., and two-year-old N.S to their home for the party. The victim also brought her boyfriend of two weeks, Gary Hurst, and his son, nine-year-old C.H. The victim had recently separated from the defendant, her husband of five years and the father of her children. Because Mr. and Ms. Powell had known the defendant since he was twelve years old, they allowed him to live in their home following his separation from the victim. However, on the day of the party, Ms. Powell asked the defendant to leave before the victim arrived and instructed him not to return until she called him. The defendant appeared "fine" and told Ms. Powell to "call [him] when [the victim left]."

Approximately an hour after the victim arrived at the Powell residence, the defendant returned and asked to see his children. Mr. Hurst looked at the defendant and said, "Hey brother, what's up?" The defendant gave Mr. Hurst "an evil look" and replied, "You know what's up." After hugging J.S., the defendant told the victim that he needed to get some of his belongings out of her vehicle. Although the victim told the defendant that he did not have anything in the vehicle, the defendant insisted that "there [was] stuff in there [the victim did not] know about." The victim, the defendant, and Ms. Powell walked to the victim's vehicle, and the defendant began "throwing stuff, moving it around real hard." The victim told the defendant to stop, and Ms. Powell called Mr. Powell on the phone and told him to come outside. Mr. Powell, who was in a motorized wheelchair due to temporary paralysis following a flu vaccine, came outside and went to the back of the

---

[1] Because many of the victims share the same last name, we will refer to Nicole Powell, the victim who died, as "the victim." The victim's parents, Betty and Jerome Powell, will be referred to by Mr. or Ms. Powell. We will refer to the remaining victims by their full name. We intend no disrespect.

[2] Count five was dismissed prior to trial. Additionally, the parties agreed to bifurcated proceedings relative to counts fourteen and fifteen. However, the State later dismissed those two charges.

[3] It is the policy of this Court to refer to minors by their initials.

victim's vehicle. Mr. Hurst, who was in the garage, also came outside and stood next to the vehicle.

The victim then volunteered that she and Mr. Hurst would leave the house in order to keep the peace. However, as she began walking toward the house to get the children, the defendant placed "her in a chokehold from behind." Ms. Powell tried to loosen the defendant's grip on the victim's neck but was unable to help. Suddenly, Ms. Powell heard "boom, boom, boom," and the victim "went limp." Mr. Powell immediately told Mr. Hurst to run; however, when Mr. Hurst turned toward the defendant, he shot Mr. Hurst in the left side. Mr. Hurst then tried to run toward the garage, but the defendant shot him three times in the legs. Mr. Powell placed his shirt on the wound on Mr. Hurst's side and showed J.S., who came out of the house following the gunshots, how to "pack [Mr. Hurst's] wound." Mr. Powell then attempted to drive his motorized wheelchair up the ramp to the front door. However, the battery died, and Mr. Powell was forced to crawl up the ramp and into the house to retrieve his pistol. While Mr. Powell was inside the house, Ms. Powell asked the defendant, "Why did you do this to me?" The defendant replied, "Because if I couldn't have [the victim], nobody was." Ms. Powell told the defendant that he "didn't have to do this," but the defendant smiled and stated that "[he] did." When Mr. Powell returned to the front porch, he observed the defendant standing in the front yard with Mr. Powell's shotgun.

Following the shootings, Ms. Powell immediately began performing CPR on the victim. She also called her sister-in-law, Rebecca Jones, who lived in a camper on the property, to assist her.[4] However, the defendant pointed the shotgun toward Ms. Powell's head and "told [her] to quit doing CPR on [the victim], or he [was] going to shoot [Ms. Powell] with it." At that point, Ms. Powell believed the victim was dead because she was turning black, so she told the defendant to go ahead and shoot her. Ms. Powell also picked up the handgun that the defendant had used to shoot the victim and Mr. Hurst in an effort to stop the defendant; however, because it did not have any bullets in it, she threw it back on the ground.

Mr. Powell, still on the front porch, told the defendant to "put the gun down. Put the gun down. Don't make me shoot you." Because the defendant noticed Mr. Powell's pistol, Mr. Powell had "no choice" and raised his gun. However, he did not shoot at the defendant because two-year-old N.S. had come outside and was holding onto the defendant's leg. When Mr. Powell hesitated, the defendant shot Mr. Powell in the side with the shotgun. Ms. Powell then grabbed N.S., and Mr. Powell began shooting toward the defendant. The defendant shot Mr. Powell again in the side with the shotgun, and after

---

[4] Ms. Jones died prior to trial.

several tries, Mr. Powell finally grazed the top of the defendant's head, causing him to fall to the ground.

Sergeant Billy Harris, previously with the Grundy County Sheriff's Department ("GCSD"), responded to a shots-fired call at the Powell residence. Upon arriving at the scene, Sergeant Harris observed the defendant lying in the middle of the yard and the victim lying near the house. The defendant had a shotgun near him and began moving as Sergeant Harris approached him. Two-year-old N.S. was running in the yard, and Sergeant Harris shouted for Ms. Powell to take him away. Sergeant Harris then detained the defendant, who was bleeding from the face and head but still conscious. After detaining the defendant, Sergeant Harris assisted in securing the scene.

Special Agent Joseph Ketron, a criminal investigator with the Tennessee Bureau of Investigation ("TBI"), arrived at the scene after it had been secured. Although the victim's body was still at the scene, Mr. Powell and Mr. Hurst had been taken to the hospital. Additionally, Ms. Powell, Ms. Jones, and the children were taken to a church across the street from the Powell's residence. Agent Ketron processed the scene, photographing and collecting all evidence. In particular, Agent Ketron collected a Smith & Wesson 9mm, a Kel-Tec .380, a shotgun, and several 9mm shell casings and bullet fragments. Agent Ketron made a concerted effort to locate spent shell casings around the victim's body. He initially conducted a visual search of the area "because the casings can eject in numerous directions." He then used metal detectors to search for the casings but was unsuccessful in locating them. However, Agent Ketron testified that this was not uncommon. On the front porch, including around the front door, Agent Ketron observed multiple shotgun projectile defects. In the garage, he observed a bullet defect in the siding of the house. When Agent Ketron entered the master bedroom of the home, he discovered a bullet that had entered the wall through the garage and came to rest behind a dresser. Agent Ketron also testified that, before transporting the defendant to the hospital, the defendant was searched, and officers discovered a loaded .380 magazine in his pocket.

Officer Avery McGinnis, previously with the GCSD, was assigned to watch the defendant at Erlanger Hospital on the night of the shootings. At one point, Officer McGinnis observed a nurse ask the defendant what happened. The defendant told the nurse that he had had a gun and that "[he] got her." After repeating himself, the defendant added, "Him too."

Special Agent Alex Brodhag, a firearms examiner with the TBI, analyzed the shell casings and firearms recovered from the Powell residence. Agent Brodhag opined the 9mm shell casings from the crime scene matched the Smith & Wesson 9mm pistol used by Mr. Powell. Agent Brodhag was able to match two of the bullet jacket fragments recovered from the scene to the Kel-Tec .380, including the fragment found in the master bedroom.

- 4 -

However, two of the fragments were unable to be matched to any of the firearms used during the shootings. Agent Brodhag also analyzed two fired shotgun shells that matched the shotgun recovered from the Powell residence. Finally, Agent Brodhag analyzed the bullet recovered from the victim's body and opined that it was fired from the Kel-Tec .380.

Dr. Erin Carney, an expert in forensic pathology, performed the autopsy on the victim. Dr. Carney testified the victim suffered at least one gunshot wound. The first bullet entered her left shoulder and traveled downward through her chest, breaking her rib, puncturing her left lung, injuring the left side of her heart, piercing her diaphragm, and traveling through her liver and pancreas before resting in a muscle near her spine. Dr. Carney also observed a graze wound on the victim's forearm. Dr. Carney opined that the bullet that grazed the victim's arm may have been the same bullet that entered her shoulder, depending on the position of her arm at the time of the shooting. According to Dr. Carney, the wound to the victim's shoulder would have been almost immediately fatal as her chest cavity would have filled with blood, making it impossible for her to breathe.

Heather Smart, director of the Grundy County 911 Call Center, authenticated 911 calls made by Mr. and Ms. Powell on the day of the shootings. The recordings were played for the jury and admitted into evidence.

At trial, Ms. Powell testified that, although the victim had a gun permit, she did not have a gun with her on the day of the shootings. On cross-examination, Ms. Powell agreed that she told police officers that the victim could have a mean streak. She testified that, after the defendant shot Mr. Hurst, he said he was sorry. However, Ms. Powell stated that the defendant was telling her that he was sorry and not Mr. Hurst. She denied telling Robbie and Michelle Lewis that the defendant shot the victim in the stomach with a shotgun. Additionally, while she agreed that she initially forgot to tell officers that she briefly picked up the defendant's handgun, she stated that she was "all to pieces" because her daughter had just died in her arms and she did not know if her husband was going to live. She stated that "they was asking me questions and I was trying to answer them to the best of my ability after everything that had just happened." However, she testified that she corrected her story two days later as soon as she remembered.

Mr. Powell suffered extensive injuries as a result of the shooting. He was flown to Huntsville Trauma Center, where he had surgery to remove his spleen, four inches of his liver, his right kidney, part of his right lung, part of his pancreas, and twenty feet of his intestines. He testified that he still has shotgun wadding and approximately one hundred shotgun pellets remaining in his body. Although Mr. Powell could not feel anything from the waist down at the time of the shootings, he began regaining the feeling in his legs approximately two to three weeks later. Mr. Powell testified that he owned the Kel-Tec .380 used to shoot the victim and Mr. Hurst. Prior to the day of the shootings, the Kel-Tec

.380 was stored under the seat of his son, Richard's, truck. On cross-examination, Mr. Powell could not recall how many shots he fired toward the defendant and did not remember telling officers that he fired four shots.

Mr. Hurst testified that he underwent two surgeries immediately following the shooting and eight total surgeries as a result of his injuries. He was in the hospital for approximately two weeks after the shootings because they "put metal in [his] leg to try to fix the bone." Mr. Hurst, who worked at an auto parts store prior to the shootings, testified that he had been unable to return to work. On cross-examination, Mr. Hurst agreed that he told defense counsel that the defendant and the victim were arguing next to the truck prior to the shooting and that, after the defendant either smacked or pushed the victim, she hit the defendant with three right crosses to his face. Mr. Hurst also testified that Mr. Powell "wobble[d]" up the ramp when his wheelchair died. He agreed that he told officers that he had "seen some things in [his] time, but [he had] never seen a crippled man stand up and run."

The defendant called Phil Headden, Julie Clark, Robert Lewis, and Michelle Lewis as witnesses. Phil Headden, the Account Manager and Director of Security for Erlanger Hospital, testified that a bullet was recovered from Mr. Hurst following the shooting. Mr. Headden testified that the hospital's standard procedure was to attempt to find the correct police jurisdiction in order to return the evidence. However, because the hospital was unable to determine which law enforcement agency had jurisdiction in this case, the hospital destroyed the bullet recovered from Mr. Hurst. On cross-examination, Mr. Headden testified that he was not aware that the hospital released Mr. Hurst's clothing to a law enforcement agency. He agreed that the hospital did not notify the TBI or the GCSD that a bullet had been recovered.

Julie Clark, a registered nurse at Sewanee Hospital, testified that the defendant was initially brought to her hospital following the shooting. She stayed by the defendant's bedside and interacted with him when she took his vitals and did a cursory assessment. Ms. Clark testified that the hospital offered to administer pain medication to the defendant, but he declined. According to Ms. Clark, the defendant did not make any statements related to the shooting while she was attending to him. On cross-examination, she agreed that she did not know what the defendant said or did once he was transferred to Erlanger Hospital.

Robert Lewis, the defendant's cousin, testified that, on the day of the shooting, he received a call from his brother-in-law regarding the shootings and immediately went to the church across the street from the Powell residence with his wife, Michelle. There, Ms. Powell told him that "[the defendant] shot [the victim] in the stomach with a shotgun at point-blank range." Mr. Lewis also testified that the victim "carried a gun everywhere she went." On cross-examination, Mr. Lewis agreed that he could not see a gun holster in the

photograph of the victim's body and could not explain where she could have carried a gun due to the clothing she was wearing on the day of the shooting.

Michelle Lewis, Robert Lewis's wife, testified that Ms. Powell told her that "[the defendant] and the victim had gotten into it, that [Ms. Powell] had jumped on his back to stop him. And that [the defendant] shot [the victim] point-blank range in the stomach with a shotgun." On cross-examination, Ms. Lewis agreed that she was closer to the defendant than to the Powells. On redirect examination, Ms. Lewis stated that the victim carried a gun "[a]ll the time." However, on recross-examination, Ms. Lewis testified that, on the day of the shooting, Ms. Powell told her that the victim's gun was at Mr. Hurst's house because he was fixing the holster.

Following deliberations, the jury found the defendant guilty of first-degree murder with regard to his actions against Nicole Powell (count one); attempted first-degree murder with regard to his actions against Gary Hurst (count two); attempted second-degree murder with regard to his actions against Jerome Powell (count three); aggravated assault and reckless endangerment with regard to his actions against Betty Powell (counts four and six); reckless endangerment with regard to his actions against Rebecca Jones (count seven); reckless endangerment with regard to his actions against J.S (count eight); reckless endangerment with regard to his actions against C.S. (count nine); reckless endangerment with regard to his actions against L.B. (count ten); reckless endangerment with regard to his actions against N.S. (count eleven); reckless endangerment with regard to his actions against R.S. (count twelve); and reckless endangerment with regard to his actions against C.H. (count thirteen). Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus twenty-two years.

The defendant filed a timely motion for new trial which the trial court denied. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions. The defendant also contends the trial court erred in admitting the 911 calls, in not allowing the introduction of proof regarding Jerome Powell's statement that "she had her gun then," and in imposing an excessive sentence. The State contends that the evidence is sufficient and that the trial court acted within its discretion in admitting the 911 calls, in not admitting Mr. Powell's statement, and in weighing the appropriate enhancement factors. However, the State concedes the trial court failed to make the required findings regarding consecutive sentencing and asks this Court to find de novo that the defendant is a dangerous offender.

## I. Admission of 911 Calls[5]

The defendant argues the trial court erred in denying his motion to exclude the audio recordings of the two 911 calls. Specifically, he argues the recordings are unduly prejudicial, cumulative, and consist of information that was not contested at trial. The State contends the trial court acted within its discretion when it allowed the State to play the two 911 calls.

Prior to trial, the defendant filed a motion to exclude the recording of the two 911 calls. He argued that the statements made in the recordings were hearsay and that large portions of the recordings were "unintelligible hysteria, which ha[d] no probative value and [were] extremely prejudicial." Following a hearing, the trial court entered an order denying the defendant's motion to exclude the recordings. The trial court noted that both callers could "clearly be heard referring to the specific address of the scene; the fact that a shooting [was] in progress; statements identifying the [d]efendant, by name, as the shooter; references to 'the grandkids' and the presence of children at the scene; and the names of specific alleged victims." Therefore, the trial court found that both calls were relevant to establishing venue and identity. The trial court also found the statements made during the calls qualified under the excited utterance exception to the hearsay rule. *See* Tenn. R. Evid. 803(2).

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

---

[5] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the defendant's brief.

Here, the defendant has failed to show the trial court abused its discretion by admitting the two 911 calls into evidence. The trial court determined the probative value of the calls was not outweighed by the danger of unfair prejudice, and we agree. The recording of the call made by Ms. Powell consists of her informing the 911 operator about the shooting, including who the perpetrator and victims were, and her address. Although the call made by Mr. Powell was more chaotic, and screaming and gunshots can be heard, Mr. Powell gave information to the operator about the shooting, his location, and the names of the victims. The defendant has failed to establish that these recordings elicited emotions of bias, sympathy, hatred, contempt, retribution, or horror. *See State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006). Rather, the record indicates the calls played for the jury merely corroborated the witnesses' testimony regarding the shootings. The defendant is not entitled to relief on this issue.

## II. Admission of Jerome Powell's Statement That "She Had Her Gun Then"

The defendant argues the trial court erred when it did not allow the admission of proof regarding Mr. Powell's statement to police that "[The victim] had her gun then." Specifically, the defendant argues there was "strong circumstantial evidence that a second firearm was in the mix when Nicole Powell was shot," and the admission of Mr. Powell's statement would have "place[d] a second gun on the scene." The State contends the trial court properly exercised its discretion when it held that the statement by Mr. Powell was irrelevant and likely to confuse the jury.

During Ms. Powell's cross-examination, the defendant attempted to question her regarding statements made during a police interview of her and Mr. Powell in their home following the shootings. The State objected, and a hearing was held outside the presence of the jury, during which the State argued that any testimony as to prior violence between the defendant and the victim would only be admissible if the defendant made a prima facie case of self-defense. The defendant stated that he was "not going into self-defense issues" but instead wanted to use the statement to address "whether or not [the victim] was in possession of a gun" at the time of the shooting. The trial court noted that, prior to trial, the defendant filed a motion to exclude evidence of prior threats by the defendant, which the trial court granted. Pursuant to that ruling, the trial court found that allowing the introduction of the statements made by the Powells regarding prior physical altercations between the defendant and the victim would "put [the trial court] at odds with [its] previous ruling about mentions of threats and past behavior."

However, the trial court allowed Ms. Powell to make an offer of proof outside of the jury's presence. During the offer of proof, Ms. Powell testified that during Mr. Powell's police interview, he stated that the victim and the defendant had previously had violent arguments, including one at Mr. Lewis's home. Ms. Powell interjected during the

interview and stated that "[the victim] can stand there with a gun on her hip. She had that gun permit." Mr. Powell then responded, "she had her gun then." However, Ms. Powell clarified that she was not referring to the day of the shootings but to a previous incident at Mr. Lewis's house. Similarly, during Mr. Powell's cross-examination, he made an offer of proof outside of the presence of the jury where he testified that during the police interview, he and Ms. Powell were referring to a fight that the defendant and the victim had at Mr. Lewis's house and not the day of the shootings.

As discussed above, Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See Clayton*, 535 S.W.3d at 859. This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *Ruiz*, 204 S.W.3d at 778).

Upon our review, we conclude the trial court did not abuse its discretion by excluding testimony regarding statements made by Mr. and Ms. Powell during their police interview recounting a prior physical altercation between the defendant and the victim. Although the defendant stated that he wished to use the statement to show that the victim had a gun at the time of the shootings, both Mr. and Ms. Powell testified during their offers of proof that the statements were not referring to the day of the shootings. Furthermore, prior to trial, the trial court granted the defendant's motion to exclude any evidence of prior threats or violence between the defendant and the victim, and if the trial court had allowed the defendant to question Mr. and Ms. Powell about the statement, then the Powells, according to their proffers, would have been allowed to discuss prior threats or acts of violence. Therefore, the evidence was properly excluded, and the defendant is not entitled to relief on this issue.

## III.     Sufficiency[6]

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[6] Although the defendant contends the evidence was "insufficient as a matter of law to support the jury verdict and judgment," the argument section of his brief contains no mention of his convictions for attempted first-degree murder, attempted second-degree murder, and aggravated assault and no rationale as to why they should be reversed.  Therefore, any claim that the evidence is insufficient to support the defendant's attempted first-degree murder, attempted second-degree murder, and aggravated assault convictions is waived.  "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7).  Accordingly, we will only address the evidence supporting the defendant's convictions for first-degree murder and reckless endangerment.

## A.    First-Degree Premeditated Murder (count one)

The defendant was convicted of one count of first-degree premeditated murder. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the defendant does not dispute that he shot the victim. Instead, he appears to argue that the State failed to establish that he acted with premeditation. Specifically, the defendant contends that no evidence was presented as to who brought the Kel-Tec .380 to the Powell residence that day. The State contends the evidence was sufficient to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence shows that Ms. Powell told the defendant to leave the Powell residence for the day because the victim and her children were coming over for a birthday party. However, the defendant returned a short time later,

and when the victim, in order to avoid an issue, attempted to leave, the defendant grabbed her and placed her in a chokehold. As Ms. Powell struggled to get the defendant away from the victim, the defendant pulled out a gun and fatally shot the victim. Additionally, when Ms. Powell told the defendant that he did not have to kill the victim, the defendant stated that "if [he] couldn't have [the victim], nobody [could]."

Looking specifically to the premeditation factors outlined by our supreme court, the record establishes the defendant initiated a physical altercation with the unarmed victim before shooting her in front of her parents and boyfriend. Afterward, the defendant did not attempt to render aid to the victim, choosing instead to shoot Mr. Hurst multiple times, retrieve a shotgun from inside the residence, threaten Ms. Powell that he would shoot her if continued to perform life-saving measures on her daughter, and shoot Mr. Powell twice. The defendant's shooting spree ended only when Mr. Powell shot and disabled him. *See Bland*, 958 S.W.2d at 660; *Larkin* 443 S.W.3d at 815-16. Accordingly, the record is sufficient to establish premeditation so as to sustain a conviction for first-degree murder.

## B.      Reckless Endangerment (counts six, seven, eight, nine, ten, eleven, twelve, and thirteen)

The defendant was also convicted for the reckless endangerment of Ms. Powell, Ms. Jones, J.S., C.S., L.B., N.S., R.S., and C.H. A person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. Tenn. Code Ann. § 39–13–103(a). At trial, the State introduced evidence to indicate the defendant fired multiple shots in the vicinity of Ms. Powell, Ms. Jones, J.S., and N.S., who were in the yard of the Powell residence, as well as C.S., L.B., R.S., and C.H., who were inside the home. This testimony was corroborated by Agent Ketron, who testified to the location of shotgun projectile defects in the front porch as well as the location of a projectile that traveled through the garage and into the master bedroom. Mr. Hurst, Mr. Powell, and Ms. Powell testified at trial that they saw the defendant shooting the Kel-Tec .380 and the shotgun. Based on this evidence, a rational jury could find the defendant guilty of reckless endangerment beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

## IV.     Sentencing

The defendant challenges the trial court's decisions regarding the length and manner of service of his sentence. He asserts the trial court misapplied enhancement factors (3), (4), (5), and (9). He further argues the trial court erred in imposing partial consecutive sentences. The State contends the trial court properly weighed the enhancement factors. However, the State concedes the trial court failed to make the requisite findings regarding consecutive sentencing but insists that consecutive sentencing is appropriate.

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## A.   Enhancement Factors

The trial court applied enhancement factors (3) the offense involved more than one (1) victim; (4) a victim of the offense was particularly vulnerable because of age or physical or mental disability; (5) the defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; and (6) the personal injuries inflicted upon . . . the victim [were] particularly great. Tenn. Code Ann. § 40-35-114(3), (4), (5), (6). The trial court specified that enhancement factor (4) applied only to count three, the attempted second-degree murder of Mr. Powell, that enhancement factor (5) applied only to count four, the aggravated assault of Ms. Powell, and that enhancement factor (6) applied only to counts two and three, the attempted first-degree murder of Mr. Hurst and attempted second-degree murder of Mr. Powell.

In considering enhancement factor (3), the trial court noted

40-35-114(3) "The offense involved more than one victim." That does apply in this case. This particular offense or offenses involved multiple victims.

The trial court erred in applying enhancement factor (3) to the defendant's convictions. Factor (3) cannot be applied to enhance a sentence when a defendant is separately convicted of the offenses committed against each victim. *State v. Freeman*, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 92 (Tenn. Crim. App. 1995). Because the defendant was convicted of separate counts for each victim present at the Powell residence during the shootings, the trial court improperly applied enhancement factor (3). *See State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002).

In applying enhancement factor (4), the trial court found

> 40-35-114(4) "The victim of the offense was particularly vulnerable because of age or physical or mental disability." I do find that that factor can apply here as Mr. Jerome Powell was in an electronic wheelchair at the time, suffering from temporary paralysis related to essentially a reaction to a vaccine.

When a trial court considers this factor, "[i]t should consider whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). This "evidence, whether lay or expert testimony, must relate to the victim's physical or mental capacity at the time of the crime and not at the time of trial or sentencing." *Id.* at 97.

Here, Mr. Powell testified that he was paralyzed from the waist down at the time of the shootings following a reaction to a flu vaccine, causing him to use a motorized wheelchair. After the wheelchair's battery died, Mr. Powell was forced to crawl onto the front porch, where he lay, unable to retreat, while the defendant shot him twice with a shotgun. Therefore, the record supports the trial court's application of enhancement factor (4) to the defendant's attempted second-degree murder conviction.

In applying enhancement factor (5), the trial court noted

> 40-35-114(5) "The defendant treated, or allowed a victim to be treated with exceptional cruelty during the commission of the offense." I find that that factor applied somewhat with regard to the aggravated assault charge on Ms. Betty Powell. This lady had a shotgun put in her face and was told to stop trying to save her daughter's life.

- 15 -

Enhancement factor (5) applies where "[t]he defendant treated, or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5). It is "well established" that this factor "requires a finding of cruelty under the statute over and above what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (citations and internal quotation marks omitted). "'Exceptional cruelty,' when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *State v. Reid*, 91 S.W.3d 247, 311 (Tenn. 2002). Enhancement factor (5) is most applicable in cases involving the torture and abuse of a victim. *See State v. Davis*, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991); *State v. Haynes*, 720 S.W.2d 76, 86 (Tenn. Crim. App. 1986). However, whether a defendant treats a victim with exceptional cruelty is "a matter of degree." *State v. Hart*, No. E2020-01144-CCA-R3-CD, 2022 WL 261950, at *7 (Tenn. Crim. App. Jan. 28, 2022), *no perm. app filed*.

While we understand the trial court's rationale in applying enhancement factor (5) to the defendant's aggravated assault conviction, we do not believe the facts in the present case, the defendant pointing a shotgun at Ms. Powell and telling her to stop performing CPR on her daughter, suggest that the defendant inflicted pain or suffering upon Ms. Powell for its own sake or his gratification. Therefore, the trial court erred in applying enhancement factor (5) to the defendant's aggravated assault conviction. However, the trial court noted that the factor only applied "somewhat," indicating the trial court gave it little weight.

Finally, although the defendant argues the trial court erred in applying enhancement factor (9), that the defendant possessed or employed a firearm . . . during the commission of the offense, the record indicates that the trial court did not apply this factor to the defendant's convictions.

Although the trial court misapplied enhancement factors (3) and (5), there is no evidence in the record to suggest the trial court gave the factors great weight. Additionally, our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Bise*, 380 S.W.3d at 706. In this case, enhancement factor (4) was applicable to the defendant's attempted second-degree murder conviction, and enhancement factor (6) was applicable to the defendant's attempted first-degree murder and attempted second-degree murder convictions. Our review of the record indicates the trial court imposed sentences within the applicable range after properly considering the evidence adduced at trial and the

sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, the potential for rehabilitation, and the evidence of enhancement and mitigating factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). The defendant is not entitled to relief on this issue.

## B.      Partial Consecutive Sentences

The defendant argues the trial court erred in imposing partial consecutive sentences. Specifically, the defendant contends the trial court failed to make adequate findings to support its conclusion that the defendant is a dangerous offender. The State concedes that the trial court failed to make the required findings but contends this Court may find de novo that the defendant is a dangerous offender.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

A trial court "may order sentences to run consecutively" if it finds the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code. Ann. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In imposing consecutive sentences on the basis that the defendant is a dangerous offender, the trial court articulated its reasons as follows:

> The [c]ourt tends to agree with the State's assessment with regard to this factor under 40-35-115, the multiple conviction statute, addressing whether or not a court can or should run things consecutively as opposed to concurrently. The State relies heavily on 40-35-114(b)(4), the factor

indicating the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. So I want to explore that and I'll do that by talking about my recollections of what the proof showed.

The proof in this case is that [the defendant] killed his wife, Nicole Powell, and that whatever problems may have existed between them, they were on the outs, they were not living together at the time, I'm not going to get into all that, there's no point to me hashing all that out, but the proof was that that young lady, that mother and this man's wife died by his hand, on her knees, in the family's front yard, with her hand up trying to protect herself so much so that the bullet that killed her grazed her arm, cut a groove in her skin, went into her upper torso and basically went straight down. Some people would call that an execution-style killing. He then turned and shot Mr. Hurst, who essentially was for all intents and purposes was an innocent bystander there. The proof adduced at trial was that the worst thing that could be said about Mr. Hurst was he might have thought that he had a new girlfriend in the making and he had been invited to a family get together. He didn't expect to leave there full of bullet holes with a ruined leg that day.

But [the defendant], the proof showed, killed Nicole Powell and then with the same pistol used to kill his children's mother, shot Mr. Hurst full of holes until that magazine was empty and there was nothing left to shoot. He then went into the family home, where he was living with Betty and Jerome Powell, who as was testified to by a number of people, essentially regarded him as a son, and had him as a part of their life and their daughter's life for two-thirds of his life. I think Mrs. Betty Powell testified since he was about 12 years old. Went through the house, that he was familiar with, because he lived there. Came back out through the front door with a shotgun in his hand, brandished the shotgun at Betty Powell and told her to stop making any effort to save her daughter's life. And then Mr. Jerome Powell during this time had taken his scooter till the battery run out, as far as he could go towards the house, and then drug himself into his own home, and got the nearest handgun he could, drug hisself, crawled, limped or otherwise compelled himself back out there to protect his wife and drew down on [the defendant] and essentially told him to put the gun down. Begged to put the gun down. Begged him to stop. All this was taking place while one of [the defendant's] own children was clinging to his legs in the front yard and Mr. Powell then told [the defendant], "Don't make me shoot you, don't make me shoot you," at which point [the defendant's] response was to shoot Mr. Powell in the guts with a shotgun. So Mr. Powell essentially emptied the magazine of his handgun all

through the porch railing and hit just about everything except [the defendant], except for one shot grazed the top of [the defendant's] head and knocked him unconscious, which was the condition in which the officers found him when they responded to the scene, he was just beginning to come around.

Some of the buckshot that didn't find its way into Jerome Powell's belly hit the front door and around the front of the house, in which house were [the defendant's] children and some other children. So that's my recollection of what the proof in the case essentially showed.

It is clear the trial court did not make even a cursory attempt to consider the *Wilkerson* factors. Because the trial court failed to make the required findings regarding factor (4), this factor does not support consecutive sentencing. *Pollard*, 432 S.W.3d at 863 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences."). Accordingly, this Court cannot defer to the trial court's exercise of discretion nor presume that the imposition of consecutive sentences was reasonable. *See State v. Carpenter*, No. W2019-01362-CCA-R3-CD, 2020 WL 7040983, at *8 (Tenn. Crim. App. Nov. 30, 2020); *State v. Robinson*, No. W2019-00216-CCA-R3-CD, 2019 WL 6876778, at *7 (Tenn. Crim. App. Dec. 16, 2019).

In *Pollard*, our supreme court explained that, when facing this situation, this Court has two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41). Because the consideration required under *Wilkerson* involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing. *Id.* Accordingly, we vacate the imposition of partial consecutive sentencing and remand to the trial court for a new sentencing hearing. The new sentencing hearing is limited to consideration of the *Wilkerson* factors to determine the propriety of consecutive sentencing in this case.

Finally, we note one issue concerning the judgments in this case. While the record indicates the State dismissed counts five, fourteen, and fifteen, the trial court did not enter separate judgment forms for these counts. *See* Tenn. R. Crim. P. 32(e)(3) ("If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall enter judgment accordingly."); *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (order) ("For charges resulting in a not guilty verdict or a dismissal, the trial court should 'enter judgment accordingly' as to the respective count."). Therefore, we remand the case to the trial court for entry of judgments reflecting the dismissal of counts five, fourteen, and fifteen.

## *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the defendant's convictions.  However, we vacate the imposition of consecutive sentencing and remand to the trial court for further proceedings consistent with this opinion.


s/ J. ROSS DYER                                    
J. ROSS DYER, JUDGE